UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>    vs.<br><br>LONNIE LEWIS WILSON,<br><br>            Defendant. | 3:06-cr-00006-02-JWS-JDR<br><br>**RECOMMENDATION ON MOTION<br>TO SUPPRESS**<br><br>(Docket Entry 31) |

       Defendant Lonnie Lewis Wilson moves to suppress physical evidence and statements taken from him on January 8, 2005. Wilson was interdicted at Anchorage International Airport by members of the Airport Drug Interdiction Team soon after he deplaned from a Continental flight arriving in Anchorage from Seattle. He argues that he was subjected to an illegal pat-down search, that his consent to search was not voluntary, and that the statements made by him should be suppressed as fruits of the illegal search. Docket entry 31. The motion is opposed by the government. Docket entry 38. For reasons stated below, I recommend that

the court adopt findings of fact and conclusions of law as set forth, and that the motion to suppress by denied.

## Factual Findings

In December 2004 special agent Marc Schmidt, DEA, worked with a confidential source (CS) regarding drug trafficking activities of Donald Brown and Lonnie Wilson, defendants herein. The CS had been arrested on a State charge and was cooperating with law enforcement officers in the hope of receiving consideration on his own charges. The CS had a felony conviction and had previously given information about three other persons leading to two drug seizures and prosecutions. The CS advised agent Smith that Brown was involved in cocaine distribution with a person named "Lonnie."

According to the CS, Brown stated that he would have some cocaine available in Anchorage during the first part of January. On January 7, 2005, Agent Schmidt learned that "Lonnie" was Lonnie Wilson, the defendant.

Agent Schmidt set up several telephone calls between the CS and Brown in an effort to purchase cocaine from Brown. On January 7, 2005, about 7:30 p.m. Brown indicated to the CS that a courier would be bringing in about 18 ounces of cocaine base to be converted to cocaine. About 10:30 p.m., the CS placed another call to Brown who indicated that he would have the drugs available for distribution no later than midnight. In an effort to accelerate the undercover

transaction, the CS indicated to Brown that he had a client from Seward who was ready to purchase six ounces but could not do all 18 ounces. Brown indicated to the CS that he would be picking up the courier at the airport. About 12:11 a.m. on January 8, Brown told the CS in a telephone call that the flight was late and that he was at the Continental [baggage claim area] waiting for the courier. The interdiction team decided to contact the courier rather than pursue an undercover purchase. Agent Schmidt met with the surveillance team to discuss the new plan.

Anchorage police officer Renée Mackey was part of the airport interdiction task force. On January 7, 2005, she received information from Agent Schmidt that a potential courier might be arriving in Anchorage about 9:00 p.m. She was provided the names of the suspected courier as Brown, Wilson, Hill, or Seymour (first name). She ran a manifest name check and found nothing for flights around that time.

About midnight January 7, 2005, Officer Mackey went to the jetway to watch passengers deplaning from a Continental flight that arrived about 12:20 a.m. She spotted an individual who was wearing baggy pants, a large sweatshirt. He walked face forward with head down while proceeding toward the baggage area. Officer Mackey contacted Agent Schmidt and then followed the individual downstairs to baggage carousel. She had constant surveillance of the individual later identified as Lonnie Wilson and observed him meet with a person who was later identified as

Donald Duray Brown.  Officer Brian Balega informed Agent Schmidt that the second individual at the baggage carousel was Wilson.  The two men waited for bags to come off the carousel.  After Wilson retrieved one checked bag, the two individuals left together.

Officer Mackey dressed in plain clothes approached Wilson from his left rear.[1]  Wilson was towing a bag and had a laptop carrier with him.  She stated to Wilson, "Excuse me."  She identified herself as Officer Mackey and showed her credentials.  She told Wilson that she was conducting drug interdiction and asked if she could talk with him for a moment.  He replied "yes."

The officer asked Wilson where he was coming from, and he told her Seattle.  She asked if he traveled a lot, and he said "sort of."  Although Officer Mackey carried a firearm, it was not visible.  She asked Wilson for a piece of identification, and he showed her a concealed weapon permit.  The officer observed that the last name on the card was Wilson, and she returned it to him.  She then asked Wilson if he was carrying any weapons or drugs.  Wilson indicated that he was not. She asked him if she could search his bag, and Wilson said "yes."  Another officer searched Wilson's checked bag in Wilson's presence.

Initially, Officer Mackey told Wilson that he was free to leave, and not under arrest.  Wilson responded, "I know that."  Wilson also agreed that Officer

---

[1] Other team members followed Brown and contacted him.

Mackey could search his laptop. Throughout the colloquy Officer Mackey spoke in a regular tone of voice.

In her nine years of experience, Officer Mackey had observed occasions where persons had made it through the screening area at the airport with a weapon. Mackey asked if he was carrying weapons, drugs, or explosives. Wilson replied "no." Officer Mackey then asked Wilson if she could do a pat-down search of his person. Wilson said "yes" and inadvertently threw up his hands. She told him he could put his hands down, and she performed a pat-down of his back, arms, and legs. During the process, she felt a hard object in the back portion of Wilson's groin area. When she did so, Wilson turned around, and she asked him what the hard object was. Wilson dropped his shoulders and his head and responded it was cocaine. She told Wilson that there were two options; he could remove the object himself or she could seek a search warrant. Wilson indicated that he would remove it.

Wilson was escorted to an office about twenty-five yards away. Agent Schmidt entered the office and asked if anyone had Mirandized (jargon) Wilson. Upon learning that no one had, he requested that that be done. Officer Brian L. Balega read Wilson the Miranda rights using a Miranda card. Wilson signed a Miranda waiver form. *See*, exh. 1. Officer Mackey left the room and Wilson removed the cocaine and undergarments that had held the cocaine from his person.[2] Wilson was

---

[2] According to the laboratory analysis, the cocaine carried by Wilson consisted of 498 grams.

photographed, fingerprinted, and processed. Wilson indicated he understood his rights and told the officers he wanted an attorney. Officer Mackey returned to the office after being told that Wilson had decided to talk.

Officer Mackey based her reasons for contacting Wilson on investigative indicators, including her observations of Wilson when he came off the airplane and because he appeared to be one of the four possible persons of interest. She considered it a random check because she had selected the person from the passengers deplaning and did not know Wilson. When she first contacted Wilson, she did not ask him to move anywhere. I accept Officer Mackey's testimony that she did not touch Wilson when he was escorted to the office. Her testimony is corroborated by Agent Schmidt. This fact is contradicted by Wilson.

Agent Schmidt clarified Wilson's desire to talk with the officers in light of his previous request for an attorney. There is no evidence that the officers did or said anything to convince Wilson to change his mind. From Wilson's own testimony, I conclude that his decision to "help himself" was based on a concern for the well-being of his family and himself.

The interdiction team decided to allow Wilson to leave for the night. As a ruse to make it seem logical, Agent Schmidt apologized to Wilson about what had happened that night, and then told him he was free to go.

Lonnie Wilson testified at the evidentiary hearing that from the beginning of the contact by Officer Mackey, he did not feel free to leave. He stated he believes there were at least three officers present although he could not identify any of the officers by description. He recalled that before being <u>Mirandized</u> one of the officers told him what he could do to help himself. Wilson testified that he thought at the time that he had no choice but to help himself. He therefore asked to speak to Officer Balega who had made that statement and asked him what he could do to help himself. At the time Wilson had not been advised of the penalties or charges that might be brought against him. Wilson had had prior contact with the law and also had a conviction for failure to appear.

From the evidence I conclude that Wilson was willing and able to decide for himself whether to pursue cooperating with the officers. Wilson admitted on cross-examination that he knew that carrying cocaine carried stiff penalties but he did not really feel nervous in Seattle when he went through airport screening. He explained that he had been threatened by Brown and his associates and only agreed to carry the cocaine because of such threats. He testified that a person named "Buster" falsely accused him of owing money and he chose to transport the drugs as a means of paying off his debt.

I reject Wilson's testimony that Officer Mackey did not tell him that he was free to leave. Wilson's explanation is that if she had told him that, he would have left.

I choose to believe Mackey's testimony over that of Wilson.  Moreover, the pattern of Wilson's responses, verbal and otherwise, reflects a desire to try to help himself by cooperating with the officers rather than trying to leave in a manner that might have enhanced suspicion.  Wilson had successfully gone through airport screening with the cocaine hidden on his person, and he knew when the officer asked to look in his checked bag or laptop carrier that he had nothing to hide in those items.  Airport screening generally consists of a magnetometer screening for metal objects.  A pat-down search is done in a manner that would not necessarily alert security officers about the identity of non-metal objects on a traveler.  It is reasonable to expect that Wilson thought that since he had cleared airport security successfully he could also successfully get by the officer's pat-down at the Anchorage airport.

Wilson admits that his head slumped when the officer asked him about the object in the groin.  It was certainly reasonable for the officer to ask to do a pat-down search after being shown a concealed weapons permit by Wilson.

By his conduct and failure to ask questions, Wilson did nothing to support his testimony that he did not feel free on January 8, 2005, to leave the Anchorage airport when confronted by Officer Mackey.

## Discussion

Wilson argues that the police encounter at the airport was unlawful because the officers were actually conducting an investigative stop rather than an

incidental stop for drug interdiction. He claims that the encounter with the police was not voluntary on his part and that his consent to search was invalid because the officers used force and a tone of voice to convey that he no option but to consent to search. He seeks to suppress his statements to police as fruits of the unlawful seizure. He also claims that the pat-down search was unlawful.

The Fourth Amendment to the U.S. Constitution protects against "unreasonable" searches and seizures. A search conducted pursuant to a voluntary consent is constitutionally permissible. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973).

The initial approach of Wilson by Officer Mackey for the purpose of asking him a few questions did not constitute a seizure. Wilson was informed by the officer why she wanted to speak with him, and Wilson agreed to talk with her. Wilson's exit was not blocked, officer Mackey was dressed in plain clothes, and there was no display of force or threatening conduct. Under the circumstances, a reasonable person would feel free to disregard the police and go about his business. Such encounter was consensual. *See*, <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991).

Whether a particular encounter is voluntary presents a factual issue depending upon the circumstances of each case. <u>United States v. Maldonado</u>, 38 F.3d 936, 937 (7th Cir. 1994), *cert. denied*, 516 U.S. 876 (1985). Here, Wilson's liberty

was not restrained by means of physical force or any show of authority which would precipitate a seizure.  See, Florida v. Bostick, 501 U.S. 429, 434 (1991).

Wilson argues that his consent to search was involuntary because his will was overborne by police actions.  Some of the factors the court considers in determining whether a consent was voluntarily given include: (1) whether the encounter occurred in a public place, which it did here; (2) whether the suspect consented to speak with the officers.  The evidence shows that Wilson verbally agreed to do so; (3) whether the officers informed the individual that he was not under arrest and was free to leave.  Officer Mackey so advised Wilson; (4) whether the individual was moved to another area.  Wilson was not asked to go to another location until after the pat-down search and his admission that he was carrying cocaine; (5) whether there was a threatening presence of several officers and a display of weapons or physical force.  The officers were dressed in plain clothes and only two officers directly approached Wilson without a show of force; (6) whether the officers deprived the defendant of documents he needed to continue on his way.  Wilson's identification was returned to him immediately and he had reached his final destination; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed.  Officer Mackey used a normal tone of voice, and the conversation was carried on in a civil manner.  The fact that the officers were conducting an investigation into alleged drug trafficking is of no moment.  The focus is upon the manner in which the

approach, detention and questioning occurred, not what precipitated it. Officer Mackey did determine early on from the defendant's identification produced that his name matched a target suspect in their investigation.

The pat-down search was lawful pursuant to the defendant's consent. From the evidence, I conclude that Wilson gave a knowing and voluntary consent to the search of the items he was carrying, as well as to the pat-down search. Wilson claims he now felt he was not free to leave. Although the truth of that claim is highly suspect, my assessment is based upon the totality of the circumstances and whether a reasonable person would have felt free to leave under the circumstances. *See*, United States v. Mendehall, 446 U.S. 544, 554 (1980). Wilson made no gesture to indicate that he wanted to leave, nor did he make any inquiry about whether he was free to leave. I conclude that he knowingly and voluntarily consented to the questioning which was conducted by Officer Mackey in a non-coercive, non-threatening and completely consensual expression by the defendant. For whatever reason, Wilson decided that it was best to cooperate with the officer in the hope that no incriminating evidence would be discovered.

The officers respected Wilson's request to invoke his right to counsel after he was Mirandized. From the evidence I conclude that Wilson on his own volition decided to help himself by answering the officers' questions. I consider it insignificant that an officer may have suggested that he could help himself by cooperating. I reject

any claim the defendant is making that his decision to cooperate with the officers was involuntary because of his fear of what his associates might do him or his family if he did not transport drugs on their behalf.

Wilson claims that when he was escorted to the police room at the airport, one of the officers touched his person. Since he was going to the office voluntarily, any touching could not have played a significant role in his voluntary removal of the drugs from his person or his response to the officers at the commencement of interrogation. Wilson certainly had enough composure to invoke his right to counsel when given the opportunity. I reject the claim that his consent to the searches or to answer questions was precipitated by any "threatening" presence of the officers or their conduct. Under the totality of circumstances Wilson consented to the pat-down of his person. Such consent was freely and voluntarily given and not the result of any duress or coercion. At the time of the consent to the pat-down Wilson was not in custody, there is no show of force, and no threat was made to obtain a search warrant if he did not consent.

Based upon the discovery of the cocaine on Wilson's person, the officers had probable cause to arrest him for trafficking in drugs. Based upon Wilson's consent to answer questions after the clarification of his waiver of Miranda rights by Agent Schmidt, his responses to those questions are admissible at trial. *See*, Edwards v. Arizona, 451 U.S. 477 (1981).

For the foregoing reasons, the motion to suppress at docket entry 31 should be denied. IT IS SO RECOMMENDED.

DATED this 18th day of April, 2006, at Anchorage, Alaska.

/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON, Wednesday, April 26, 2006**, to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON, Tuesday, May 2, 2006**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).